# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Steven R. Crandlemere

    v.                                          Case No. 15-cv-516-JL
                                                Opinion No. 2017 DNH 192
Nancy A. Berryhill,
Acting Commissioner, Social
Security Administration


## O R D E R


Pursuant to 42 U.S.C. § 405(g), Steven Crandlemere moves to reverse the Acting Commissioner's decision to deny his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings consistent with this order.

## I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the

resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted). Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam). Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts. That statement, document no. 16, is part of the court's record and will be summarized here, rather than repeated in full.

In 2004, diagnostic imaging of Crandlemere's lumbar spine revealed degenerative disk disease at L5-S1 and mild degenerative changes at L4-L5. On June 3, 2009, while at work, Crandlemere aggravated his back condition when he fell off a standup mower after hitting a bump. On November 19, 2009, he

underwent back surgery.  His post-surgery treatment has included

physical therapy, several different pain medications,[1] and

various injections.[2]  On four occasions, starting on August 30,

2010, one of Crandlemere's treating physicians, Dr. David Tung,

described Crandlemere's surgery this way:  "failed back surgery

[status post] laminotomy/discectomy with left L5-S1

radiculopathy."[3]  Administrative Transcript (hereinafter "Tr.")

451, 460, 471, 486.

The record in this case includes more than a dozen opinions

on Crandlemere's physical capacity for work.  Those opinions are

reported in:  (1) a Progress Note by Dr. Jie Cheng, a treating

physician; (2) New Hampshire Workers' Compensation Medical Forms

("Comp Forms") completed by four different treating physicians,

Dr. Cheng (one form), Dr. Davis Clark (two forms), Dr. Clifford

Levy (eight forms), and Dr. Tung (four forms); (3) a Physical

---

[1] In the year following his surgery, Crandlemere was
prescribed Ocycodone, Lidoderm patches, Flexeril, Neurotrin,
Roxycodone, and Percocet.  In October of 2010, he was diagnosed
with opioid dependence.

[2] Specifically, he was given a trans-foraminal epidural
steroid injection on May 17, 2010, and a sacroiliac joint
injection on October 15, 2010.

[3] Radiculopathy is a "[d]isorder of the spinal nerve roots."
Stedman's Medical Dictionary 1622 (28th ed. 2006).

Residual Functional Capacity ("RFC")[4] Assessment performed by Dr. Burton Nault, a non-examining state-agency physician; (4) a Medical Source Statement of Ability to Do Work-Related Activities (Physical) completed by Dr. Levy; (5) a Medical Source Statement of Ability to Do Work-Related Activities (Physical) completed by Dr. Ihab Ziada, a treating physician; and (6) a physical RFC assessment performed by Dr. Marcia Lipsky, a non-examining state-agency physician. The opinions that are relevant to the court's analysis of the ALJ's decision are described below.

Dr. Nault's RFC assessment is dated January 26, 2010, approximately two months after Crandlemere's back surgery. In it, he opined that by June 3, 2010, _i.e._, 12 months after the alleged onset date ("AOD") of Crandlemere's claimed disability, he would be able to lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk (with normal breaks) for about six hours in an eight-hour work day, sit (with normal breaks) for about six hours in an eight-hour workday, and push/pull with no

---

[4] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1519.

limitations other than those for lifting and carrying.[5]  Dr.
Nault further opined that Crandlemere would be able to
occasionally perform the postural activities of climbing (ramps,
stairs, ladders, ropes, and scaffolds), balancing, stooping,
kneeling, crouching, and crawling.

In the narrative portion of his RFC assessment, Dr. Nault
described Crandlemere's back injuries and the treatment he had
received before his surgery.  He then described the effects of
Crandlemere's surgery:

> Follow up on 12/21/09 by Dr. Levy supported no
> neurological deficits and a negative straight leg
> raising.  He recommended physiotherapy, which the
> claimant states he is getting now, but is still having
> some residual back pain.
>
> The claimant currently states he is getting
> improvement with physiotherapy and home exercise
> program on a slow basis, helped by stretching
> exercises and a treadmill.

Tr. 334.  Dr. Nault concluded his RFC assessment with the
following summary:

> At this time the claimant has [medically determinable
> impairments] established as noted above [i.e.,
> degenerative disc disease of the lumbar spine status
> post discectomy at L5-S1].  A listings level
> impairment is not supported; however, he is still
> considered totally disabled at this time, but it is
> reasonable to assume that within 12 months of his AOD

---

[5] Those exertional limitations correlate to a capacity for
light work.  See 20 C.F.R. § 404.1567(b).

he should return to a functional capacity as addressed
in Section 1.

Tr. 334.  Finally, while he described Crandlemere as "totally
disabled" as of the date of his assessment, Dr. Nault did not
identify the specific limitations that rendered him so.[6]

On July 28, 2010, Dr. Levy completed a Comp Form.  In it,
he opined that on that date, despite the June 3, 2009, injury,
Crandlemere:  (1) had no limitation on his ability to sit,
stand, or walk; (2) had several postural limitations; and (3)
could return to work for a maximum of four to eight hours a day,
three to five days a week, so long as he did not have to
lift/carry more than ten pounds occasionally and five pounds
frequently.

Dr. Levy's Medical Source Statement of Ability to Do Work-
Related Activities (Physical) is dated December 8, 2010.  In it,
he opined that Crandlemere could lift/carry 10 pounds
occasionally and less than 10 pounds frequently, that his
abilities to sit, stand, and walk were unaffected by his
impairment, and that he could occasionally perform the postural
activities of climbing, kneeling, crouching, crawling, and

------------------------

[6] That lack of specificity means that there is no frame of
reference for evaluating Crandlemere's progress toward achieving
the functional capacity that Dr. Nault predicted.

stooping.  Finally, the form that Dr. Levy completed asked for his opinion on whether Crandlemere was "capable of gainful employment on a sustained basis," Tr. 441, and Dr. Levy responded: "Yes, 4-8 hours per day 3-5 hrs per day,"[7] id.

Dr. Ziada's Medical Source Statement of Ability to Do Work-Related Activities (Physical) is dated July 16, 2013.  In it, he opined that Crandlemere could lift/carry 10 pounds occasionally and less than 10 pounds frequently, stand/walk (with normal breaks) for less than two hours in an eight-hour work day, and sit (with normal breaks) for less than six hours in an eight-hour workday.  He also opined that Crandlemere needed to "periodically alternate sitting and standing to relieve pain or discomfort," Tr. 1219, and was limited in his ability to push/pull.  He then indicated that his conclusions regarding exertional limitations were supported by the following findings: "lumbar spondylosis with radiculopathy [and] back pain with

_____

    [7] Given Dr. Levy's prior opinion that Crandlemere could work four to eight hours per day, three to five days per week, see Tr. 435, the court presumes, as does the Acting Commissioner, that in his December 8 Medical Source Statement, Dr. Levy meant to say the same thing, and that his reference to "3-5 hrs per day," Tr. 441, rather than "3-5 days per week," was a scrivener's error.

muscle spasm."[8]  Tr. 1219.  Dr. Ziada further opined that

Crandlemere could never perform the postural activities of

climbing, balancing, stooping, kneeling, crouching, and

crawling, and he supported his opinion by stating that "because

of back pain [Crandlemere] is limited to moving [and] he

requires meds, [and must be able to] change position

frequently."  Id.  In addition, Dr. Ziada identified several

manipulative and environmental limitations.  Finally, Dr. Ziada

opined that Crandlemere:  (1) was "limited to jobs where he . .

. [would be] would be allowed to take unscheduled breaks to

relieve pain or discomfort," Tr. 1221; (2) was not "capable of

gainful employment on a sustained basis," id.; and (3) was

likely, on account of his condition, "to be absent from work

three or more times per month," id.

Crandlemere first applied for DIB on July 29, 2009.  His

quest for DIB has followed what can only be described as a long

and winding road.  To begin, Crandlemere's claim was denied at

the initial level, and then he received an unfavorable decision

---

[8] Spondylosis is "[a]nkylosis of the vertebra, often applied
nonspecifically to any lesion of the spine of a degenerative
nature."  Stedman's, supra note 3, at 1813.  Ankylosis is
"[s]tiffening or fixation of a joint as a result of a disease
process, with fibrous or bony union across the joint; fusion."
Id. at 95.

from an Administrative Law Judge ("ALJ").  Crandlemere appealed

the ALJ's decision to this court, which remanded.  <u>See</u>

<u>Crandlemere v. Astrue, No. 11-cv-529-SM, 2013 WL 160334 (D.N.H.</u>

<u>Jan. 15, 2013)</u>.  In his remand order, Judge McAuliffe

identified, as reversible error, the ALJ's reliance on Dr.

Nault's opinion when the prediction in that opinion, <u>i.e.</u>, that

Crandlemere would no longer be disabled as of June 3, 2010,

"appear[ed] to have been incorrect."  <u>Id. at *4</u>.  As evidence of

the incorrectness of Dr. Nault's prediction, Judge McAuliffe

pointed to the opinions contained in nine Comp Forms completed

by Drs. Levy and Tung between February 1, 2010, and January 14,

2011.  Judge McAuliffe described Dr. Levy's opinions this way:

> By July of 2010, Dr. Levy concluded that claimant had
> recovered to the point that he was capable of lifting
> a maximum of 10 pounds occasionally and five pounds
> frequently, and could work a maximum of four to eight
> hours a day, three to five days a week.  At best,
> then, Dr. Levy believed claimant was capable of
> performing the exertional requirements of <u>sedentary</u>
> work, on a less-than full-time basis.  Dr. Levy
> repeated that opinion several times in the months that
> followed.  But, he never concluded that claimant was
> capable of a return to full time work . . . .

<u>Id.</u> (emphasis in the original, citations to the record omitted).

While Crandlemere's 2009 claim was working its way through

the review process, he filed a second claim, which was

consolidated with his first one, in a decision by the Appeals

Council ("AC") that vacated the ALJ's unfavorable decision on Crandlemere's second claim.

Crandlemere received a hearing before an ALJ on his consolidated claim. At that hearing, a vocational expert ("VE") testified that a person with the RFC described in Dr. Ziada's Medical Source Statement would not be able to perform any jobs. After the hearing, the ALJ issued an unfavorable decision. The AC reversed and remanded.

On remand, Crandlemere received yet another ALJ hearing. At that hearing, the ALJ asked the VE to consider "someone of similar age, education, and vocational background who is limited to sedentary work with a sit/stand option at will," Tr. 717, and completed the hypothetical by asking the VE to consider a person who

> [c]an occasionally perform all of the postural
> maneuvers. Occasionally means up to a third of the
> work day. Is limited to simple, unskilled work, and
> is able to maintaining attention and concentration for
> two-hour increments throughout an eight-hour work day
> and 40-hour work week.

Id. The VE testified that a person fitting the ALJ's hypothetical could perform the jobs of document preparer, addresser, cutter and paster, stuffer, and eyeglass frame polisher.

After the hearing, the ALJ issued a decision in which he gave: (1) significant weight to the opinions in Dr. Nault's January 2010 RFC assessment; (2) significant weight to the opinions in Dr. Levy's Medical Source Statement, except for the limitation to working "4-8 hours per day, 3-5 hours per [week]," Tr. 674, to which the ALJ gave limited weight; (3) lesser weight to the opinions in Dr. Ziada's Medical Source Statement; (4) some weight to the opinions in Dr. Cheng's Progress Note; and (5) limited weight to the opinions in the Comp Forms completed by Drs. Cheng, Clark, and Levy. The ALJ did not specifically mention the Comp Forms completed by Dr. Tung.

The ALJ's decision also includes the following relevant findings of fact and conclusions of law:

> 4. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, a right knee meniscus tear, obesity, a learning disorder, and depression (20 CFR 404.1520(c)).
>
> . . . .
>
> 6. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he would need to be allowed a sit/stand option at will; he could occasionally climb, balance, stoop, kneel, crouch, and crawl; he is limited to simple-unskilled work; and he is able to maintain attention and concentration for two-hour increments throughout an eight-hour workday.

. . . .

11.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

Tr. 666, 668, 677.  The ALJ concluded by finding that Crandlemere was not disabled because he was capable of performing the five jobs identified by the VE.

Claimant appealed the ALJ's decision to the AC, but the AC deemed the appeal untimely and declined to consider it.  This action followed.

## III. Discussion

### A.  The Legal Framework

To be eligible for disability insurance benefits, a person must:  (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. § 423(a)(1)(A)-(D).  The only question in this case is whether the ALJ correctly determined that Crandlemere was not under a disability from June 3, 2009, through September 30, 2011, that last date on which he was insured for disability insurance benefits.

To decide whether a claimant is disabled for the purpose of
determining eligibility for DIB, an ALJ is required to employ a
five-step process.  See 20 C.F.R. § 404.1520.

> The steps are:  1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20
C.F.R. § 416.920, which outlines the same five-step process as
the one prescribed in § 404.1520).

The claimant bears the burden of proving that he is
disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He
must do so by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

### B.  Crandlemere's Claims

Crandlemere claims that the ALJ erred by:  (1) making

several mistakes in evaluating the medical opinions on his

physical RFC; (2) failing to include a limitation to performing

at "below average pace" in his mental RFC; and (3) determining,

at step 5, that the jobs the VE identified existed in

significant numbers in the national economy, and relying on VE

testimony that was not consistent with the Dictionary of

Occupational Titles.  Claimant's first argument is persuasive,

and dispositive.

With respect to the ALJ's evaluation of the medical

opinions, Crandlemere claims that the ALJ committed these

errors:  (1) failing to give controlling weight to the opinions

in Dr. Ziada's Medical Source Statement; (2) giving inadequate

reasons for giving significant weight to the opinions in Dr.

Nault's RFC assessment; (3) erroneously crediting some of the opinions in Dr. Levy's Medical Source Statement but discounting Dr. Levy's limitation to working four to eight hours a day, three to five days a week; (4) failing to evaluate the opinions in the Comp Forms completed by Drs. Clark and Tung, and in particular Dr. Tung's recurrently stated opinion that he needed to change positions frequently; and (5) failing to explain the exclusion of one of the limitations identified in Dr. Cheng's Treatment Note, i.e., that he required a job that allowed a "frequent change of position," Tr. 336. Taken in combination, the ALJ's treatment of the opinions rendered by Drs. Ziada and Nault warrants a remand.

The court begins with the ALJ's evaluation of the opinions in Dr. Ziada's Medical Source Statement. Dr. Ziada was a treating physician, and the ALJ acknowledged as much in his decision. Under the applicable regulations, the opinion of a treating source is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give controlling weight to the opinion of a treating source, he must still determine how

16

much weight to give that opinion by considering these factors:
(1) the length of the treatment relationship and the frequency
of examination; (2) the nature and extent of the treatment
relationship; (3) the supportability of the opinion; (4) the
consistency of the opinion with the record as a whole; (5) the
specialization of the source offering the opinion; and (6) any
other relevant factors.  See § 404.1527(c)(2)-(6).  After an ALJ
performs the analysis described above, "[i]n many cases, a
treating source's opinion will be entitled to the greatest
weight and should be adopted, even if it does not meet the test
for controlling weight." Hunt v. Colvin, No. 16-cv-159-LM, 2016
WL 7048698, at *7 (D.N.H. Dec. 5, 2016) (quoting Social Security
Ruling 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996)).
Finally, an ALJ must give "good reasons in [his] decision for
the weight [he] give[s] [a claimant's] treating source's
opinion." 20 C.F.R. § 404.1527(c)(2).

> To meet the "good reasons" requirement, the ALJ's
> reasons must be both specific, see Kenerson v. Astrue,
> No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May
> 20, 2011) (citation omitted), and supportable, see
> Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir.
> 2010).  In sum, the ALJ's reasons must "offer a
> rationale that could be accepted by a reasonable
> mind." Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL
> 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v.
> Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D.
> Mass. Mar. 21, 2011)), report and recommendation
> adopted by 2012 WL 1676984 (D.N.H. May 14, 2012).

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6
(D.N.H. Aug. 27, 2015).

The ALJ gave Dr. Ziada's opinions "lesser weight," Tr. 674,
and explained his evaluation of those opinions this way:

> First, while I acknowledge that [Dr. Ziada] does have
> a treatment history with the claimant, he only
> specializes in internal medicine and thus lacks any
> particularized expertise in the claimant's alleged
> physical impairments.  Second, while he provided one
> of the most recent assessments of record, he provides
> very limited narrative support or citations to the
> record in support of his very restricted range of
> part-time work, but rather largely check-marks a
> standard form.  This provides limited support for his
> substantial findings as described.

Tr. 674.  There are several problems with the manner in which
the ALJ evaluated Dr. Ziada's opinions.

First, while the ALJ's decision to give Dr. Ziada's
opinions lesser weight necessarily signals a decision not to
give them controlling weight, the ALJ never said so directly,
and did not frame his consideration of Dr. Ziada's opinions in
terms of the controlling-weight analysis described in the
applicable regulations.  But, to give the ALJ's decision the
benefit of the doubt, the court will presume that he concluded
that Dr. Ziada's opinions were not "supported by medically
acceptable clinical and laboratory diagnostic techniques," 20
C.F.R. § 404.1527(c)(2), and, for that reason, saw no need to

18

reach the issue of consistency with the other evidence in the record. However, the ALJ did not give good reasons for concluding that Dr. Ziada's opinions were not adequately supported.

The ALJ criticizes Dr. Ziada's opinion for lacking narrative support, but Dr. Ziada did identify clinical findings for his exertional limitations ("lumbar spondylosis with radiculopathy [and] back pain with muscle spasm," Tr. 1219), and he offered a narrative explanation for his postural limitations ("because of back pain he is limited to moving [and] he requires meds, [and must be able to] change position frequently," id.). That is more support than was provided by Dr. Levy for opinions to which the ALJ gave significant weight, see Tr. 438-41, 674, and at least as much support as was provided by Dr. Nault for opinions to which the ALJ also gave significant weight, see Tr. 327-34, 674.[9] Beyond that, the day before Dr. Ziada gave his

_____

[9] The Acting Commissioner contends that "Dr. Nault provided a much more detailed explanation for his opinion (with citations to relevant evidence and objective data) than Dr. Ziada." Resp't's Mot. to Affirm (doc. no. 13-1) 8. But the bulk of Dr. Nault's narrative explanation is devoted to Crandlemere's condition before his surgery. The only objective data relating to Crandlemere's post-surgery condition is a reference to a lack of "neurological deficits and a negative straight leg raising," Tr. 334, as of December 21, 2009, i.e., about a month after Crandlemere's surgery.

opinion, he examined Crandlemere and made these findings: "tender lower back L3-4 level / loss of lumbar lordosis[10] / spasm [of the] paraspinal muscles."  Tr. 1268.  The ALJ does not even mention Dr. Ziada's examination in his discussion of Dr. Ziada's opinions and, necessarily, makes no argument that the manner in which Dr. Ziada examined Crandlemere did not constitute a "medically acceptable clinical . . . diagnostic technique[]," 20 C.F.R. § 404.1527(c)(2).  In short, the ALJ's characterization of Dr. Ziada's opinion as poorly supported is, itself, poorly supported.

Equally problematic is the ALJ's criticism of Dr. Ziada's opinion for having been expressed on a check-box form.  To be sure, there is authority for the proposition that an "ALJ may 'permissibly reject[] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions.'" Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996); citing Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001)).  But Dr. Ziada's check-box form did include explanations, which the ALJ largely ignored.  Moreover, while "'check-box' forms that

_____

[10] "Lumbar lordosis" is "the normal, anteriorly convex curvature of the lumbar segment of the vertebral column." Stedman's, supra note 3, at 1119.

20

require little or no explanation . . . are 'weak evidence at best' in the disability context, and . . . are particularly so . . . when compared to . . . more detailed accounts," Hevner v. Comm'r Soc. Sec., 675 F. App'x, 182, 184 (3d Cir. 2017) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)), the opinions to which the ALJ gave significant weight are no more detailed than the opinions expressed on Dr. Ziada's Medical Source Statement. Finally, the fact that an opinion is expressed on a check-box form "is not a proper basis for rejecting [such] an opinion [when it is] supported by treatment notes." Esparza v. Colvin, 631 F. App'x 460, 462 (9th Cir. 2015) (citing Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014)). Here, the record includes a treatment note by Dr. Ziada dated one day before he prepared his Medical Source Statement, see Tr. 1267-70, and while that note seems to support Dr. Ziada's opinion, the ALJ said nothing about it. In sum, under the circumstances of this case, the fact that Dr. Ziada's opinion is expressed on a check-box form is not a good reason for discounting it.

Because the ALJ's characterization of Dr. Ziada's opinion as unsupported is itself unsupportable, and because the ALJ did not even address the second controlling-weight factor,

consistency with the other evidence of record, the court agrees with claimant that the ALJ failed to give good reasons for declining to give controlling weight to Dr. Ziada's opinions.

However, even if the ALJ had given good reasons for declining to give controlling weight to Dr. Ziada's opinions, he did not give good reasons for giving those opinions "lesser weight." As a preliminary matter, like the explanation for discounting a treating source's opinion at issue in Jenness, the explanation offered by the ALJ in this case "suffers from a general lack of specificity," 2015 WL 9688392, at *7. That is, rather than being tied to any of the specific opinions expressed in Dr. Ziada's Medical Source Statement, the ALJ's explanations are "generic criticisms seemingly directed to Dr. [Ziada's] statement as a whole." Id. That flies in the face of the ALJ's obligation to "provide specific reasons for assigning weight to a treating source's opinion." Id.

That said, the court turns to the ALJ's consideration of the six factors for weighing medical opinions. See 20 C.F.R. § 404.1527(c)(2)-(6). As the court has already explained, the ALJ's consideration of supportability, see § 404.1527(c)(3), is fundamentally deficient. While the ALJ acknowledged Dr. Ziada's status as a treating source, he said nothing further about the

length of the treatment relationship, the frequency of examination, or the nature and extent of the treatment relationship.  See § 404.1527(c)(2)(i)-(ii).  Similarly, the ALJ said nothing about the consistency of Dr. Ziada's opinions with the record as a whole, see § 404.1527(c)(4), nor did he identify any relevant "other factor," see § 404.1527(c)(6).  Rather, apart from a  purported lack of supportability, the ALJ rested his evaluation of Dr. Ziada's opinion on the fact that Dr. Ziada is an internist rather than an orthopedist, see § 404.1527(c)(5).

The ALJ's bare observation that Dr. Ziada is an internist is not a good reason for discounting his opinions.  As noted, the ALJ said nothing about the nature of Dr. Ziada's treatment relationship with Crandlemere.  However, the record demonstrates that as far back as September of 2012, Dr. Ziada had been prescribing pain medication for Crandlemere's back condition, and was concerned enough about that condition to refer him for an orthopedic consultation with Dr. Clark.  Dr. Clark, in turn, diagnosed Crandlemere with right lumbar radiculitis and completed a Comp Form in which he opined that Crandlemere had no work capacity.  The record also demonstrates that the day before Dr. Ziada rendered the opinion at issue, he:  (1) examined

Crandlemere and noted a tender lower back at the L3-4 level, a
loss of lumbar lordosis, and spasm of the paraspinal muscles;
(2) diagnosed Crandlemere with chronic back pain and lumbar
radiculopathy; (3) prescribed pain medication; and (4) ordered
an MRI to further explore Crandlemere's lumbar radiculopathy.
In light of Dr. Ziada's history of treating Crandlemere for his
back condition, the mere fact that he is an internist is not a
good reason to give his opinions "lesser weight."

So, the ALJ failed to give good reasons for the weight he
gave to Dr. Ziada's opinions. Moreover, there are significant
problems with the ALJ's determination that Dr. Nault's opinion
was entitled to significant weight.

Completed in January of 2010, about two months after
Crandlemere's surgery, Dr. Nault's RFC assessment did not
describe Crandlemere's then-current level of functioning but,
rather, predicted his RFC as of June 3, 2010. To borrow a
phrase from Dr. Nault's opinion, "it is reasonable to assume,"
Tr. 334, that his prediction of Crandlemere's RFC four months
hence was based upon an assumption that his surgery had been
successful. But, in August of 2010, a treating physician began
describing Crandlemere's November 2009 procedure as "failed back
surgery." Tr. 451. Obviously, that undercuts the value of Dr.

Nault's opinion as substantial evidence for the projected RFC he assigned Crandlemere.

For his part, the ALJ did not characterize Dr. Nault's opinion as a January 2010 prediction of Crandlemere's RFC in June of 2010.  To the contrary, he wrote of "the remote assessment of State examiner Burton Nault, M.D., dated January 2010, which found that the claimant could perform a wide range of light-exertional work with occasional postural activities."  Tr. 674 (emphasis added).  Dr. Nault "found" no such thing.  He found that Crandlemere was disabled, and predicted that his disability would dissipate by June.[11]  After pointing out that Dr. Nault "is an Agency physician familiar with the disability program," Tr. 674, the ALJ further explained his decision to give significant weight to Dr. Nault's opinions:

> Second, while [Dr. Nault's] opinion is fairly remote
> in time, and thus did not consider the recent evidence
> of record, this more recent evidence does not support
> a substantial erosion of the occupational base.
> Third, the residual functional capacity above does
> contain an additional allowance that the claimant be
> limited to sedentary, rather than light work, and that
> he be allowed a sit-stand option at will, which would
> adequately allow for his reported residual pain as

---

[11] As Judge McAuliffe explained more than four years ago, the ALJ who wrote the very first decision on Crandlemere's claim made the same mistake, treating Dr. Nault's opinion as an assessment of a then-current RFC rather than a prediction of a future RFC.  See Crandlemere, 2013 WL 160334, at *4.

> described above and is more consistent with the
> treating orthopedist above.  For these reasons, I
> afford the assessment of Dr. Nault significant weight,
> yet further reduce the claimant to a range of
> sedentary work.

Tr. 674.

While the ALJ determined that "this more recent evidence
does not support a substantial erosion of the occupational
base," he did not identify the "more recent evidence" to which
he was referring.  The Acting Commissioner attempts to rectify
that omission by pointing to both medical data and opinion
evidence that, in her view, support the ALJ's evaluation of Dr.
Nault's prediction.[12]  However, it is well established that "the
court cannot affirm the ALJ's decision based upon rationales
left unarticulated by the ALJ." Jenness, 2015 WL 9688392, at *7
(citing High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6

---

[12] Among other things, the Acting Commissioner relies on a
set of radiology reports that post-date Dr. Nault's RFC
assessment, suggesting that findings such as "[n]o evidence of
reherniation," Tr. 411, validate Dr. Nault's opinions.  Claimant
relies on those same radiology reports, suggesting that findings
such as "enhancing scar tissue on the laminotomy site and around
the left S1 nerve root," Tr. 409, invalidate Dr. Nault's
opinions.  Reading arguments by lawyers that rest upon their own
interpretations of the very same radiology reports aptly
illuminates the rationale for the rule against allowing ALJs to
fashion RFCs by interpreting raw medical data.  See Schwarz v.
Berryhill, No. 16-cv-163-SM, 2017 WL 3736789, at *6 (D.N.H. Aug.
30, 2017) (citing Childers v. Colvin, No. 14-cv-270-JL, 2015 WL
4415129, at *2 (D.N.H. July 17, 2015)).

(D.N.H. Mar. 17, 2011)).  Thus, the ALJ's undeveloped reference to "more recent evidence" is an insufficient basis for crediting Dr. Nault's prediction.[13]  Turning to the ALJ's third reason for giving significant weight to Dr. Nault's opinion, whatever else it may be, the ALJ's decision to assign Crandlemere an RFC that was more restrictive than Dr. Nault's RFC can hardly be considered a reason for giving Dr. Nault's opinion significant weight.  Indeed, the only logical conclusion to be drawn from the ALJ's decision to assign Crandlemere a more restrictive RFC than Dr. Nault did is that that ALJ found that Dr. Nault's opinion overstated Crandlemere's RFC and, consequently, discounted it rather than crediting it.  In any event, the ALJ's deviation from the RFC expressed in Dr. Nault's opinion is not substantial evidence to support the ALJ's assignment of significant weight to that opinion.

---

[13] Moreover, at least some of the "more recent evidence" directly undercuts the validity of Dr. Nault's prediction.  A big part of the "objective data" that the Acting Commissioner touts as supporting Dr. Nault's opinion is Crandlemere's negative straight leg raising test on December 21, 2009.  But, on April 27, 2010, Crandlemere was unable to perform a straight leg raise "due to extreme pain," Tr. 369, and he had positive straight leg raising tests on August 30 and October 10, 2010, see Tr. 445, 455.  So, to the extent that Dr. Nault's prediction was premised upon a presumption of continued negative straight leg raising test results, his prediction is undercut rather than supported by the more recent evidence on that issue.

To summarize, the ALJ did not give good reasons for the weight he gave to Dr. Ziada's opinions, and his decision to assign substantial weight to Dr. Nault's opinions is not supported by substantial evidence.  Taken together, the ALJ's errors in evaluating those opinions warrant a remand.

## IV. Conclusion

For the reasons described above, the Acting Commissioner's motion for an order affirming her decision[14] is denied, and Crandlemere's motion to reverse that decision[15] is granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court shall enter judgment in accordance with this order and close the case.

     **SO ORDERED.**

_____
Joseph Laplante
United States District Judge

Dated:  September 15, 2017

cc:  Janine Gawryl, Esq.
    T. David Plourde, AUSA

---

[14] Document no. 13.

[15] Document no. 10.

28